MILLS, Acting Chief Judge.
The City of Winter Haven (City) petitions for review of a PERC order finding it guilty of an unfair labor practice and ordering it to sign and give effect to a certain collective bargaining agreement which it had submitted to the Teamsters Local # 444 (Union).
The Union and the City reached an impasse on 28 May 1975. On 29 July 1975 a special master was appointed, and on 15 September 1975 the special master issued his report which recommended, among other things, that the employees in the unit (firefighters) receive a minimum salary of $8,098.00, “plus the average salary increase in the current bargaining period for Cities in the local operating area. . . . ”
On 18 September 1975, the City Commission met in special session. Mr. Paul Poth-in, the City’s labor consultant, reported that he had reviewed the special master’s report with the City Attorney and the City Manager and that:
. .it appears as though the recommendations of the Special Master are consistent with the city’s last and best offer to the employees. Therefore, my recommendation and that of the City Manager would be that the City Manager be directed to offer the Union the contract proposal if, in fact, they do ratify what our offer was.”
Mr. Pothin added that if the Union did not ratify he recommended:
. . that those benefits be implemented unilaterally by the administration without contract so that the employees will not be deprived of benefits that we’ve already stated that we feel are proper.”
The benefits were described as holidays, raising of the minimum pay, “. . . and those other elements that are contained in the award”. Mr. Pothin’s recommendation was approved by the Commission.
On 19 September 1975, the City Manager informed the Chairman of PERC by letter with a copy to the Union, that the City Commission had adopted the findings of the special master; that the Union had been furnished certain contractual provisions to be added to the provisions tentatively agreed upon and that “subsequent to ratification by the local membership, the City agrees to enter into and execute the agreement in whole”. On the same date a collective bargaining agreement containing the following provision was given to the Union:
*1376 “(a) No employees covered by this agreement shall be paid at a rate of less than $8,098.00 per annum.
(b) Further, the City agrees to pay the employees covered by this agreement the ‘average salary increase’ granted for cities in the ‘local operating area’ effective October 1, 1975.”
On 25 September the Union received a letter or letters from the City Manager which stated that there had been a misunderstanding and that the City was rejecting the special master’s award regarding wages and the Union should delete Paragraph (b) from the tentative agreement. Later on that same day, the Union ratified the agreement with Paragraph (b) still included. On 26 September 1975, the Union notified the City of the ratification and thereafter presented the City Manager with a copy of the agreement for his signature. The City Manager refused to sign the agreement because of the wage provision.
The Union filed an unfair labor practice charge, PERC issued a complaint, and a hearing before a hearing officer was held on 4 March 1976. On 6 July 1976, the hearing officer issued his recommended order concluding that the City had committed an unfair labor practice and exceptions were filed by the City. PERC held a hearing on 3 August 1976, and on 25 January 1977 issued its decision and order which affirmed the hearing officer’s rulings on motions and adopted his findings of facts and recommendations.
The major issue raised in this proceeding is whether the correspondence from the City Manager to the Union on 25 September effectively rejected the special master’s report and revoked the agreement submitted to the Union. PERC concluded that because “. . . there is no evidence in the record that would indicate that the City Commission authorized the City Manager to revoke its acceptance of the special master’s recommendation”, the revocation was ineffective.
The chief executive officer of a public employer is required by law to bargain collectively in good faith with the representative of the employee organization and to consult with, and attempt to represent the views of, the legislative body of the public employer. Section 447.309(1), Florida Statutes (1975). Any agreement reached between the chief executive officer and the employees’ bargaining agent must be ratified by the legislative body of the public employer at a regularly scheduled meeting before it becomes binding on the employer. Section 447.309(1). If the legislative body does not ratify the tentative agreement, or if the majority of the employees do not ratify, the agreement is returned to the chief executive officer and the employee organization for further negotiations. Section 447.309(4).
If the impasse occurs, a special master may be appointed to define the areas in dispute, to determine facts, and to render a decision on unresolved issues. After hearings are held the recommended decision of the special master is sent to the representatives of the parties and the “. . . decision shall be discussed further by the parties in negotiations and shall be deemed approved by both parties unless either party, by formal action, rejects the decision within 15 calendar days of the transmission of the decision.” Section 447.403(2)(b). If the decision of the special master is rejected by either of the parties, the chief executive officer submits to the legislative body a copy of the decision and his recommendations for settling the dispute. The employee organization may also submit recommendations. The legislative body then conducts a public hearing at which the parties explain their positions and thereafter the legislative body takes such action as is in the public interest. Section 447.403(2)(c).
Sections 447.309 and 447.403 clearly delineate the specific functions of the chief executive officer and the legislative body throughout the course of the collective bargaining process. As provided in Section 447.309(1), the chief executive officer is to consult with and attempt to represent the views of the legislative body; however, the authority of the chief executive officer to represent the public employer during nego *1377 tiations is derived from the Act and is not dependent upon a grant of authority from the legislative body of the public employer. Further, the discussions and consultations of the chief executive officer with the legislative body relative to collective bargaining are exempt from Section 286.011 and need not be held in the “sunshine”. Section 447.-605(1), Florida Statutes (1975). Therefore, PERC’s conclusion that the rejection of the special master’s decision was ineffective because there was nothing in the record to show that the City Commission had authorized the City Manager to reject the decision is unfounded.
PERC also contends that the rejection was ineffective because the 18 September meeting constituted the final legislative action contemplated by Section 447.-403(2)(c)(4) and therefore was binding. This contention has no merit. The provisions of Section 447.403(2)(c) are applicable only after the special master’s decision has been rejected by one of the parties. The special master’s decision was not rejected until 25 September.
Finally, PERC argues that the special master’s report was not rejected by “formal action” as required by Section 447.-403(2)(b), contending that formal action within the context of Section 447.403(2) involves ratification at a meeting of the legislative body. However, PERC’s own rules rebut its argument. Rule 8H-5.13, F.A.C., clearly indicates that the formal action required by Section 447.403(2)(b) is' accomplished “. . by serving a written statement upon all other parties, within fifteen (15) calendar days from the date said recommended decision was transmitted to the parties, specifically indicating which particular recommendations are being rejected.” In this case the City Manager gave the Union a written statement within the requisite time period stating specifically which recommendation was being rejected. Therefore, we hold that the rejection of the special master’s decision was valid and the City was not bound by the recommended decision. However, this holding does not end our inquiry.
After the special master’s decision was received, the City drafted an agreement, which adopted the recommendations of the special master, and forwarded it to the Union which subsequently ratified it. PERC apparently found that the City’s revocation of part of the agreement prior to the Union’s ratification was invalid and found that the City had committed an unfair labor practice by refusing to sign the agreement as originally offered to the Union.
Section 447.403, Florida Statutes, describes the procedure to be followed in resolving impasses; however, the fact that impasse resolution procedures have been put into effect does not preclude the parties from attempting to reach an agreement at the negotiating table pursuant to Section 447.309. Section 447.309(1) provides:
“Any collective bargaining agreement reached by the negotiators shall be reduced to writing, and such agreement shall be signed by the chief executive officer and the bargaining agent. Any agreement signed by the chief executive officer and the bargaining agent shall not be binding on the public employer until such agreement has been ratified at a regularly scheduled meeting of the public employer and by public employees who are members of the , bargaining unit . . .."
We do not find any evidence in the record, and PERC did not find, that the Union negotiators had agreed to the terms of the tentative agreement offered by the City. Obviously the draft agreement was not.an “agreement reached by the negotiators”, and the City Manager had no obligation to sign it. If the Union’s bargaining agent had agreed to the City’s offer prior to the City’s revocation of the offer, then the refusal of the City Manager to sign such agreement clearly would be an unfair labor practice. However, that is not what occurred in this case, and PERC’s conclusion that the City had committed an unfair labor practice by refusing to sign the agreement is erroneous.
We therefore hold that the City’s rejection of the special master’s decision was *1378 valid and that the City did not commit an unfair labor practice by refusing to sign the agreement as ratified by the Union.
REVERSED.
SMITH, J., concurs.
ERVIN, J., dissents.